William "Will" A. Graven
Email: wgraven@inproseofmontecristo.com
15801 S. 48th Street, Apt. 1195
Phoenix, Arizona 85048
Telephone: 623-217-0966
Facsimile: 480-374-1708

√ FILED ___ LODGED
___ RECEIVED ___ COPY

MAR 24 2011

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ M. DEPUTY

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

CIV 11 0556 PHX NVW

|  |  |
|---|---|
| In Re: | CASE NO. _____ |
| Will Graven, an individual, | Case Filed: **March 24, 2011** |
| Plaintiff, | **Assigned for all practical purposes to the Honorable Judge** _____ |
| v. |  |
| President Barak H. Obama; the U.S. Department of the Interior; Assistant Secretary of the Interior for Indian Affairs Lawrence Echo Hawk; Deputy Assistant Secretary of the Interior for Indian Affairs George Skibine; the Bureau of Indian Affairs; BIA Pima Agency Superintandant Cecilia Martinez; BIA Western Regional Director Bryan Bowker; BIA Director Michael Black; and BIA Deputy Director Mike Smith, | **PLAINTIFF'S COMPLAINT FOR AN ACTION IN THE NATURE OF MANDAMUS (28 U.S.C. SECTION 1361) TO COMPEL SEVEN OFFICERS AND TWO AGENCIES OF THE UNITED STATES TO SIMPLY PERFORM A STATUTORY (NONDISCRETIONARY) DUTY (LONG) OWED TO THE PLAINTIFF UNDER 25 U.S.C., CHAPTER 6, SUBCHAPTER 1, SECTION 229. INJURIES TO PROPERTY BY INDIANS** |
| Defendants. |  |

## INTRODUCTION

Plaintiff hereby, respectfully, and humbly, files this Complaint against President Barak

H. Obama (Plaintiff does not name the President, to "*showboat*," but does so only for purposes

as defined/required by his [the President's] being specifically named in 25 U.S.C. Section 229,

and based upon his "involvement" to date [As an inexperienced In Pro Se, Plaintiff is not able to

determine if the President's defined participation in Section 229 is purely "ministerial," or more.

Based upon first impression, it appears to be more than just ministerial, and thusly, the President

1

is named herein.]); the United States Department of the Interior; Assistant Secretary of the

Interior for Indian Affairs Lawrence Echo Hawk (formerly [until 1977], the "Commissioner of

Indian Affairs" [as per Section 229]); Deputy Assistant Secretary of the Interior for Indian

Affairs George Skibine; the Bureau of Indian Affairs; BIA Pima Agency Superintendant Cecilia

Martinez; BIA Western Regional Director Bryan Bowker; BIA Director Michael Black; and

BIA Deputy Director Mike Smith.

### The Purpose of this Action

This is an action by the Plaintiff to obtain an Order from this Court compelling (per

Section 1361) the Defendants to fulfill their/the nondiscretionary mandate of 25 U.S.C., Section

229. Injuries to property by Indians (the mandate is to take the "further steps" "as shall be

proper" "in the opinion of the President" "to obtain satisfaction for the injury." [i.e., the

President is to sponsor "further steps," i.e., "sit down" and negotiate satisfaction/a reasonable

settlement for such injury or injuries] [in a Section 229 matter, the United States is the

guarantor, not a directly liable party, so while the U.S. would pay the agreed to settlement costs,

the U.S. would be reimbursed by the injuring party[ies] [Please see **Note "1"** below]), which

reads, in whole, as follows (**Exhibit "1"**);

```
-EXPCITE-
    TITLE 25 - INDIANS
    CHAPTER 6 - GOVERNMENT OF INDIAN COUNTRY AND RESERVATIONS
    SUBCHAPTER I - GENERALLY
-HEAD-
    Sec. 229. Injuries to property by Indians
-STATUTE-
        If any Indian, belonging to any tribe in amity with
the United States, shall, within the Indian country, take
or destroy the property of any person lawfully within such
country, or shall pass from Indian country into any State
or Territory inhabited by citizens of the United States,
and there take, steal, or destroy, any horse, or other
property belonging to any citizen or inhabitant of the
United States, such citizen or inhabitant, his
representative, attorney, or agent, may make application to
the proper superintendent, agent, or subagent, who, upon
being furnished with the necessary documents and proofs,
shall, under the direction of the President, make
application to the nation or tribe to which such Indian
```

shall belong, for satisfaction; **and if such nation or tribe shall neglect or refuse to make satisfaction**, in a reasonable time **not exceeding twelve months**, such **superintendent**, agent, or subagent **shall** make return of his doings to the **Commissioner of Indian Affairs**, that such **further steps** may be taken as **shall be proper**, in the opinion of the **President, to obtain satisfaction for the injury**. (bold, and underline emphasis added by the Plaintiff)
-SOURCE-
      (R.S. Sec. 2156.__


     -COD-
                         CODIFICATION
        R.S. Sec. 2156 derived from acts June 30, 1834, ch. 161, Sec. 17,
     4 Stat. 731; Feb. 28, 1859, ch. 66, Sec. 8, 11 Stat. 401.
     -TRANS-
                     TRANSFER OF FUNCTIONS
        For transfer of functions of other officers, employees, and
     agencies of Department of the Interior, with certain exceptions, to
     Secretary of the Interior, with power to delegate, see Reorg. Plan
     No. 3 of 1950, Secs. 1, 2, eff. May 24, 1950, 15 F.R. 3174, 64
     Stat. 1262, set out in the Appendix to Title 5, Government
     Organization and Employees.
     -MISC1-
                         INDIAN AGENTS
        The services of Indian agents have been dispensed with. See note
     set out under section 64 of this title.
     -End-

The Plaintiff has <u>no</u> expectation that this Court will Order a specific settlement, ***Plaintiff only seeks an Order that the Defendants work with the Plaintiff to reach a settlement***, as simply mandated by Section 229, and as this statue has been put into practice.

**Note "1":** Plaintiff apologizes to Native Americans everywhere, for employing a statue that has historical implications which are not very pleasant, but the Plaintiff, after three and one-half of years of tricks, games, deception and inaction by the BIA, must invoke this statue for his own family, former employees, and business associates (and Plaintiff quietly hopes, his efforts herein will benefit the actual Beneficial Owners/Landowners of the Memorial Airfield Corporation [the site of the events at issue]).

### The Events at Issue

The events at issue in this that cause Section 229 to be applicable, and subsequently, a Section 1361, became evident on September 7, 2007. The Plaintiff first made application to BIA Pima Agency Superintendent Cecilia Martinez (the "proper superintendent," as per Section 229, as the events at issue occurred on the Gila River Indian Community [and the Pima Agency is the

BIA's agency on the Gila River Community]), on October 17, 2007 (to be seen later as an

Exhibit). The BIA's Western Regional Office, located in Phoenix, and the BIA's "Central

Office," located in Washington, D.C., were also involved. Both the Pima Agency, and the

Western Regional Office, became involved (as the matter was "kicked upstairs" from the Pima

Agency), actually, beginning just before that "fateful" day, September 7, 2007. And then, the

Office of the Assistant Secretary of the Interior for Indian Affairs became involved, with finally,

the President being appealed to in a Section 229 application to him (but only after the Plaintiff

had waited more than years, and having tried everything else he could think of, and the BIA and

Assistant Secretary were not fulfilling their duties).

Additionally, Gila River Community members, who are also victims of the events at

issue, began their own efforts with the BIA and Assistant Secretary, parallel to the Plaintiff's

(the BIA has not responded to these Community members, who are Trust Clients of the BIA [as

is well known by this Court, the BIA's fiduciary responsibilities actually require that they take

immediate action in such events/circumstances as will be alleged [but they did not], and have

the legal authority to do so, of course]).

The BIA represented to the Plaintiff, from the beginning of the events at issue, that there

was nothing to fret over, as they were the authority/law, of the issues, and that they would not

allow anything to occur that would be contrary to the laws of the United States, including

anything that would be disruptive to the Plaintiff's rights to quiet enjoyment, for the Plaintiff's

lawfully being on the Gila River Community, using his validly Subleased parcel of land, and

leasehold improvements thereon, while operating his businesses.

### The BIA Sets The Tone, But Then Does Not Follow Through

The BIA did set the Gila River Community (the "GRIC") straight on various matters

related to the events at issue, as is memorialized in a particularly important 11 page letter that

will be introduced later as an Exhibit. This 11 page letter included the BIA reminding the GRIC

that they (the BIA) had previously informed the GRIC as to the legal reality of the events at

issue, and that the GRIC had been wrong in its "interpretation" (in quotes, as "interpretation" has particular meaning later) of these legal realities, and that they (the GRIC) had been instructed to not take any action contrary to such BIA mandated legal realities, but they (the GRIC) took unlawful acts, and thusly we have the events at issue. The BIA letter reiterated that the GRIC should not take any such acts, including, specifically mentioning, against the Plaintiff.

On the morning of the December 7, the BIA was yet telling the Plaintiff not to worry, that the GRIC would not act contrary to its (the BIA's) instructions. The BIA again suggested, as it had several times over the previous 3 months, that the BIA would have U.S. Marshalls accompany the Plaintiff and his employees to and from Plaintiff's property, if needed.

On the afternoon of December 7, 2007, the GRIC physically removed the Plaintiff from his validly Subleased property ("valid," per the BIA itself, to be seen later in multiple Exhibits), and leasehold improvements, by taking, stealing, and destroying a volume of valuable property and other assets owned by the Plaintiff.

### The BIA Tells The Plaintiff (over and over) They Will Get Things Fixed, and Start Periodic Reports

On January 9, 2008, the BIA wrote to the Plaintiff (in part, due to Senator John McCain's involvement), informing the Plaintiff that they were working to correct the events at issue (the "BIA Corrective Efforts").

Every few months, the Plaintiff would receive another similar letter from the BIA.

The Plaintiff traveled to Washington, D.C. and met with then Acting Assistant Secretary of the Interior for Indian Affairs, (Defendant) George Skibine, on October 30, 2008. Defendant Mike Smith attended this meeting, and was told by Defendant Skibine to get this matter fixed.

Nothing happened, but the BIA letters did keep coming every few months…

### Plaintiff Expands His Efforts to a Related, But Separate Action, by Filing a Section 229 Appeal to the President

Finally, in a related, but separate effort (the "Section 229 Effort") ("separate" from waiting for the BIA to take corrective measures), some two years after the events at issue began,

on November 13, 2009, the Plaintiff wrote President Obama (Plaintiff shall refrain from saying "Defendant" Obama), invoking Section 229 (documentation of this communication shall be shown later as an Exhibit). The then new Assistant Secretary of the Interior for Indian Affairs, Mr. Lawrence Echo Hawk (and others [including the Defendants]) were copied on this communication with President Obama.

### Plaintiff Begins to Appeal the Inaction of the BIA

With regards to the BIA's Corrective Efforts, nothing had happened by December 13, 2010 (more three years after the events at issue began). The Plaintiff filed An Appeal from Inaction against the BIA Western Regional Director, (Defendant) Bryan Bowker, on December 13, 2010 (a later Exhibit) (the Gila River members mentioned earlier, also filed an Appeal from Inaction).

Defendant Bowker did not respond to the Plaintiff's Appeal from Inaction (the Gila River members experienced the same results: nothing, at all, from Defendant Bowker).

### Plaintiff Files a Notice of an Appeal with the IBIA

The Plaintiff then filed a Notice of an Appeal with the Interior Board of Indian Appeals (the "IBIA"), on December 29, 2010 (a later Exhibit) (the Gila River members mentioned earlier, also filed a Notice of an Appeal with the IBIA).

The IBIA Ordered Defendant Bowker to file a report with the IBIA by February 4, 2011.

### Defendant Bowker Disavows that the BIA has any Responsibility to Take Corrective Action, or Intentions to Assist Plaintiff with Restitution for the Events at Issue (ignoring the mandates of Section 229) (after three years, of, apparently, just leading the Plaintiff on)

This next point is very important to this Section 1361/Mandamus like Complaint: In Defendant Bowker's reply to the IBIA (to be seen later as an Exhibit), he stated (besides that they were still working on the events at issue):

"In a January 7, 2011, response to an inquiry made by Senator McCain on Mr. Graven's behalf, we indicated that "with respect to the termination of Mr. Graven's sublease (and the "confiscation" of certain personal property which allegedly followed), we have advised Mr. Graven to seek recourse directly from the GRAA, which (acting as the presumptive mater lessee) was/is responsible for those actions."

So, after the Plaintiff had been waiting for more than three years, and having gone broke and lost everything in the process, and repeated promises of pending corrective action (documented in numerous letters from the BIA [to be seen later as Exhibits]), the BIA claimed that they had told the Plaintiff to seek recourse from the GRIC ("GRAA") (in effect, telling the Plaintiff to get lost).

None of the numerous letters from the BIA over the last three years ever made such suggestions, *and is entirely contrary to the mandate of Section 229*.

The BIA has told the GRIC, in writing, they are not the "presumptive master lessee." Defendant Bowker lied to the IBIA to say this, as he sought to justify his/the BIA's sad handling of the events at issue.

Plaintiff cannot imagine, what the ethics or character of a man are (Bowker), who knows someone was robbed, and broken by the events at issue, and that man (Bowker) does not even have the decency to write or mail a copy to me what he was telling Senator McCain (or the GRIC members who also lost everything, and are his Trust Clients).

Apparently, the BIA will continue to work on the matters of the BIA's corrective Efforts, until the end of time (while the GRIC Community members starve/live in despair as a result).

### This Complaint is in Regards to the Section 229 Efforts by the Plaintiff.
This Complaint for an Order of a mandamus nature, is not to direct the BIA to finally make a decision to settle the events at issue (that matter is in front of the IBIA, for both the Plaintiff, and the GRIC members).

Based upon Defendant Bowker's above statement, and the acts, or lack of acts, by all of the Defendants, as to be further described below (including by Exhibits), are at the root of this Complaint for this Court to now take the extraordinary measure to issue an Order to direct the Defendants to follow the nondiscretionary mandates of Section 229, and meet with the Plaintiff to work out a settlement.

**The Plaintiff Tries Another Effort/Files an Appeal from Inaction Against the Assistant Secretary (before deciding to come to/trouble this Court)**

With regards to the Plaintiff's Section 229 Efforts at issue in this Complaint, as nothing had happened by January 28, 2011 (more than one and one half years after the Plaintiff first wrote the President and Assistant Secretary, and more than three after the Plaintiff first wrote the BIA), the Plaintiff filed An Appeal from Inaction against Defendant Echo Hawk (a later Exhibit).

Defendant Echo Hawk did not respond to the Plaintiff's Appeal from Inaction.

**Plaintiff Files a Notice of an Appeal Against the Assistant Secretary with the IBIA**

The Plaintiff then filed a Notice of Appeal with the Interior Board of Indian Appeals, on February 15, 2011 (a later Exhibit).

However, while the IBIA Docketed Plaintiff's Appeal, it was then also immediately Dismissed (March 7, 2011) (a later Exhibit) as the IBIA Ruled that does not have jurisdiction over the Assistant Secretary (nor would they, of course, have jurisdiction over the President).

It is clear, that the Assistant Secretary (Defendant) Echo Hawk, is not fulfilling his duty, nor his responsibility to President Obama in this matter, as mandated in Section 229.

Plaintiff has again recently spoken with two of the Assistant Secretary's attorneys; his Chief of Staff; and two Administrative Assistants, in just the last few weeks (which included their calling me, and my calling them) (but nothing came from these conversations [which see more about later]).

So, the Pima Agency Superintendant will not do anything; the Western Regional Director will not do anything; neither the BIA Director nor Deputy Director will do anything; nor will the Assistant Secretary, or the Deputy Assistant Secretary.

**Finally, the Plaintiff is left with no Alternative but Seek the Assistance of this Court**

Plaintiff has exhausted all remedies, except the one that is the subject of the present Complaint.

Therefore, to further support Plaintiff's Complaint for a 28 U.S.C. Section 1361 Action

to compel an officer of the United States to perform his duty, Plaintiff alleges as above, and

below;

## JURISDICTION

1. The Jurisdiction of this Court is proper pursuant to;

(a) Title 28, Section 1331 of the United States Code, this being an action arising under the Constitution and laws of the Untied States.

(b) Title 28, Section 1361 of the United States Code, an Action to compel an officer of the United States to perform his duty

(c) Title 5, Sections 701 through 706, Section 10 of the United States Code,  the Administrative Procedure Act

(d) Title 25, Section 229 of the United States Code, Injuries to property by Indians

## VENUE

2.       28 U.S.C. Section 1391(e), as amended, provides that in a civil action in which

each defendant is an officer or employee of the United States, or any agency thereof,

acting in his official capacity, or under the color of legal authority, a U.S. District Court

is proper, and that the action may be brought in any judicial district in which a defendant

in the action resides, or operates. Plaintiff is a resident of Phoenix, for which the U.S.

District Court is the District of Arizona, and Defendants all operate within this District

of Arizona. Therefore, this Court is a proper venue for this action.

## INTERESTS OF THE PLAINTIFF

3.       Plaintiff was a businessman, operating several businesses, from his validly

Subleased parcel of land on the Gila River Indian Community, at the Memorial Airfield.

Plaintiff suffered theft, and destruction of his property by Indians (Native Americans) of

the GRIC.

## NATURE OF THE PLAINTIFF'S ALLEGATIONS

4.       Plaintiff alleges that certain members of the Gila River Indian government took,

stole, and destroyed substantial property of the Plaintiff's, in an illegal seizure by these

certain government members, based upon non-existent legal rights to control the

Memorial Airfield.

## DEFENDANTS

5.      The Defendants, all in official capacities, are BIA Pima Agency Superintendant

Cecilia Martinez; her supervisor, BIA Western Regional Director Bryan Bowker; his

supervisor BIA Director Michael Black, and his Deputy Director Mike Smith; and their

supervisor Assistant Secretary of Indian Affairs Lawrence Echo Hawk, and his Deputy,

George Skibine; and the two agencies that are responsible herein (for whom the

Defendants, except the President, work for), the U.S. Department of the Interior, and its

Bureau of Indian Affairs; and, as he is named in the controlling statue for this Complaint

(Section 229), the Honorable President of these great United Sates, President Obama.

## INVOLVEMENT AND LIABILITY OF DEFENDANTS

6.      The Defendants each have liability in this action for reasons as described in 25

U.S.C., Section 229, including: the "proper superintendant." While Superintendant

(Defendant) Martinez is the "proper superintendant," she could claim that that her

responsibility in this matter under Section 229 was kicked upstairs to her supervisor,

BIA Western regional Director Bryan Bowker…who could also claim that his

responsibility in this matter was kicked upstairs to his supervisor, BIA Director Michael

Black…who could say that he is not named in Section 229, but that his supervisor, is, the

Assistant Secretary of the Interior for Indian Affairs (or, as per the statute, the

"Commissioner of Indian Affairs")…who might say that his Deputy George Skibine has

been handling this mater for quite some time…and Defendant Skibine could say that he

had ordered Deputy Director Mike Smith to handle this matter.

So, while Plaintiff is not certain Who's on first, I know the players are as described

herein, and all have refused to take the action they are required to in Section 229, and

thusly, Plaintiff has named them in this Complaint.

Noting however, the plain language of Section 229, only names Superintendent

Martinez; Assistant Secretary Echo Hawk; and President Obama.

## ALLEGATIONS COMMON TO THIS ACTION

7.  In early 2005, the Plaintiff noticed from/while driving Queen Creek Road, on the
    eastside of I-10, on the south side of Phoenix, an older airport. Plaintiff, being a
    longtime aviation enthusiasts, and as a developer and contractor, was
    immediately curious about this airport. Plaintiff was to learn that this airport was
    on the Gila River Indian Community, and that it was known as the Memorial
    Airfield.

8.  The Plaintiff, was to learn the Airfield (allegedly) belonged to the Gila River
    Indian Community ("GRIC"). The Plaintiff approached the GRIC about
    development opportunities there. Plaintiff was directed to the Gila River Airport
    Authority ("GRAA").

    By chance, while pursuing the GRAA, Plaintiff was introduced to, and invited to
    meet with, and then later assist the Maricopa Queen Creek Landowners
    Association ("MQCLA") in developing their collective allotted lands that
    surround the Airfield. The MQCLA represented some 11,000 acres of the best
    potential development land in greater Phoenix.

    Plaintiff became quite active on the GRIC, as can be seen in **Exhibits "2a"
    through "2k".**

    Referring to **Exhibit "2a," page 6, Reference 1,** from a February 2007 Audit by
    the GRIC of the Airfield, this shows that the Plaintiff had proposed a joint
    venture to develop the Airfield with the GRAA by August of 2006 (the complete
    Audit is a later Exhibit).

9.  Referring to **Exhibit "2b,"** this document shows that the Plaintiff acquired an
    Option to purchase what Plaintiff had learned was the only tenant on the Airfield
    with a valid long-term Sublease (the other tenants' long-term subleases had
    expired, but remained on the Airfield through BIA approved and therefore valid
    year-to-year subleases due to the annual renewal through the "holdover clause"
    in these other tenants subleases). Plaintiff bought this Option for several reasons
    including he had heard this tenant was not liked by the GRAA, and was a
    roadblock to development (so Plaintiff's buying this troublesome tenant out was
    seen by the Plaintiff as a way to improve relations with the GRIC); for a
    development office for the MQCLA land that surrounded the Airfield (which the
    Plaintiff had become very involved with); and for the Plaintiff's own airplanes.

    The Plaintiff ultimately Exercised his Option (per **Exhibits "2c" and "2d"**), and
    acquired "Biegert Aviation/Farwest Aviation, Inc., which held a valid long-term
    Sublease on almost 15 acres of land, and had a large hangar/office building on
    such Subleased land.

10. During this time, the Plaintiff was asked for a bribe by Councilman John Antone,
    who told the Plaintiff, that as he (Antone), was the Chairman of the Natural
    Resources Committee; he (Antone) could either be a friend, or a foe, in
    Plaintiff's Development plans.

11. The Plaintiff was to quietly be told/learn (as if it was somewhat secretive), from

his relationships with many/hundreds of the approximately 4,000 Landowners of the MQCLA (with some 1,100 to 1,250 attending any given/various Plaintiff sponsored MQCLA meetings), that approximately 600 of these 4,000 also and actually controlled some 85% plus (with the remainder being owned by the GRIC itself) of the 1,350 acres under the Airfield (with another 200 Airfield Landowners not being members of the MQCLA [for total of approximately 800 Airfield Landowners]).

The Memorial Airfield Corporation was/is the "Master Lessee" of the 1,350 acres (with the Landowners being the Lessors).

Plaintiff was to learn that while the GRIC/GRAA was claiming/exercising control of the Memorial Airfield Corporation ("MAC"), and its Master Lease, the GRIC did not actually have legal right to control such.

Plaintiff was also to learn that the actual beneficial owners of the MAC, were the 800 Landowners, and that these 800 Landowners were also to control the Board of Directors (six of seven seats [to be elected by the Landowners], with the 7th seat being for the GRIC).

In other words, the MAC was never intended to be, nor was it a Tribal enterprise. It was meant to be an enterprise by the people, for the people ("self-determination" for the people, not just their Tribe [as was intended when the allotted lands were awarded in 1934])

Plaintiff confirmed all of these contrary-to-the-GRIC/GRAA-owning-the-Airfield Landowner allegations with the BIA. The BIA told the Plaintiff that the MAC Master Lease had never been assigned from the Memorial Corporation to the GRIC/GRAA, and that the GRIC/GRAA had been bullying their was around the Airfield, but that the Tribe made it all but impossible for the Landowners to push/fight back (i.e., in part, through fraudulent misrepresentation [of the legality of the GRIC/GRAA's seizure of the Airfield] [to a populace who knew little about such legal maters], and in part through "Tribal retribution").

12. Plaintiff was asked, by hundreds of the Landowners from his MQCLA relationships, to also help with reclaiming, and reorganizing the Memorial Airfield Corporation for the Landowners.

The Plaintiff discussed this with the BIA, and the BIA stated that the rightful control of the Airfield was something of mess that needed to be cleaned up, and that if I were to help the Landowners, they (the BIA) would support the Landowners, and my efforts with the Landowners (in part, as the Airfield did in fact belong to the Landowners, and in part, as the BIA had been very pleased, even impressed, with my work with the MQCLA Landowners).

13. The Plaintiff agreed with the many MAC Landowners that had approached him, to host a Memorial Airfield Corporation Landowners/beneficial owners meeting at his hangar and offices at the Airfield on August 25, 2007 (**Exhibit "3"**). The Landowners were ecstatic. They elected a new Board, and left the meeting thinking they were off and running. There is a great deal of pride for these

12

Landowners in their ownership of the Airfield, in part, as the land has been in the families for quite some time, and in part, as the Airfield was a U.S. Military training field during World War II. That the Airfield was theirs, and not the GRIC's, is another source of pride.

14. 12 days after hosting the MAC Landowners, on September 7, 2007, the Plaintiff was sent an Eviction Notice by the GRIC/GRAA (**Exhibit "4"**).

15. But the Eviction was not quite as simple as it might seem (being the result of my assisting the Landowners). While it appears obvious that the Plaintiff's helping the MAC Landowners reorganize, prompted the Eviction Notice, Plaintiff was to later learn that certain individuals of the GRIC Tribal government started trying to have the Plaintiff removed, through efforts with the BIA, initially, by at least June 2006 (**Exhibit "5,"** **page 2, References 1 and 2**) (Please see **Note "2"** just below).

This June 2006 eviction effort started not long after I turned down Councilman Antone for his requested/demanded bribe (Councilman Antone is not a Landowner).

**Note "2":** This **Exhibit "5"** will be an often referred to Exhibit, as it is the single best source for a historical sense, and a "reckoning," of the illegal seizure of the Airfield, and the illegal eviction, and subsequent "take/steal/theft, and destruction of Plaintiff's property…and this **Exhibit "5"** is in the BIA's own words (and, it includes the BIA recounting, and controverting, throughout Exhibit "5," a number of GRIC claims, in the GRIC's own words] [per page 1 and 2 of **Exhibit "5"**]).

16. Plaintiff's claim that the GRIC/GRAA had started to seek his removal in June of 2006, can be seen in what appears to be an official Notice of Trespass from the BIA, dated June 29, 2006 (**Exhibit "6"** [and as the GRIC referred to in **Exhibit "5," page2, Reference 2**),]).

17. However, as has been shown, this Notice of Trespass, at the GRIC/GRAA's urging (again, per **Exhibit "5," References 1 and 2**), was based upon their "*interpretation*" of the language of Plaintiff's Sublease, with such "*interpretation*" being that Plaintiff needed an Approval of Assignment of the Sublease for the Corporation/tenant that the Plaintiff had purchased (albeit, there was no assignment [which see more about as we go]) (Please see **Note "3"** just below). This interpretation becomes nothing more than an excuse to take/steal and destroy Plaintiff's property.

**Note "3":** This issue of the GRIC/GRAA's "*interpretation*" of the Plaintiff's Sublease needing BIA Approval, is *the key issue/basis* for the GRIC/GRAA's alleged right to evict (and take, steal and destroy) Plaintiff from his validly Subleased property. Shortly, the BIA will advise the Plaintiff, and the GRIC/GRAA, that no assignment was needed…but the GRIC/GRAA would not accept the U.S. Governments Ruling, and ultimately, they (the GRIC/GRAA) just plain took the law (and the MAC Master Lease) into their own hands (very contrary to law, and orders from the BIA), and robbed the Plaintiff and destroyed his property.

18. The BIA, in its October 19, 2007 letter (**Exhibit "5"**) to the GRIC/GRAA,
    recounts how they (the BIA) put the issue of the GRIC/GRAA's "interpretation"
    to rest (**Exhibit "5,"page 8, References 8 and 11**).

    Noteworthy, is that the BIA not only puts this issue to rest (actually, it never
    should have been an issue), but even makes "light" of its "Notice of Trespass" to
    the Plaintiff, stating, that some "confusion then arose" (**Exhibit "5," page,
    References 18 and 19**) ("confusion" caused by the GRIC's "interpretation" [and
    that Deputy Superintendant of the Pima Agency was dating one of the GRIC staff
    attorneys]).

    In the October 19 letter/**Exhibit "5," page 8, Reference 3**, the BIA also states
    that **"if"** an Approval of Assignment **"had been needed**," this would have been
    an issue that would have easily been rectified [under the terms of the Plaintiff's
    Sublease]), and in fact, an Approval of Assignment could not have been
    "unreasonable withheld," as a simple, "non-monetary default".

19. On August 2, 2006 (**Exhibit "7"**), the BIA corrected its "confusion" over the
    Plaintiff's Notice of Trespass, when the BIA wrote:

    "After further review, it is our determination that the Request for Approval
    documents is not necessary." (underline emphasis added by the Plaintiff)

    The GRIC/GRAA's Auditor, in a later Exhibit, will remind the GRIC/GRAA
    (*before* the GRIC/GRAA eviction/robbed the Plaintiff) that this was the BIA's
    ruling (which see as a later Exhibit).

20. This matter of the GRIC/GRAA's "interpretation" was now a done/over/gone/put
    to rest issue, and done so by the U.S. Solicitor…the Plaintiff's Sublease was
    valid. As per the BIA on October 19, 2007, in **Exhibit "5,' page 8, Reference 4**:

    "From that point forward, both GRAA and ABS Aviation (Plaintiff's company)
    have been aware of the BIA's position that sublessor consent and BIA approval
    were/are not needed with respect to the stock purchase,…" (referring to the
    Plaintiff's purchase of the Biegert Aviation/Farwest Aviation, Inc. stock [then
    later, changing the name of such corporation to ABS Aviation Development]).

21. As best the Plaintiff knew, all was quiet from August 2, 2006 (the date of BIA's
    Ruling on the Plaintiff company's Sublease), until September 7, 2007 (when the
    Plaintiff's Eviction Notice was sent by the GRIC/GRAA).

22. However, the Plaintiff did know (until recently receiving a copy of the October
    19 letter/Exhibit "5"), that the GRIC/GRAA had not given up on evicting the
    Plaintiff, and that they (the GRIC/GRAA) had taken another run at the Plaintiff
    in July of 07 (**Exhibit "5,' page 2, Reference 5**).

    The GRIC/GRAA is then/yet claiming (in July 2007), that there were:
    "unresolved issues brought to light by the tenancy audit, including the status of
    Mr. Graven's sublease…"

There were no "unresolved issues" as the BIA states immediately below

the just above statement, when the BIA replies that (**Exhibit "5,' page 2,**

**Reference 6**) they had fully addressed the questions of Plaintiff's sublease at

GRAA and GRIC Council meetings, and in other forums.

The **<u>GRIC itself</u>**, <u>even states</u>, (**Exhibit "5,' page 2, Reference 7**):

"…and the Superintendent was appearing regularly at Authority and landowner meetings ***<u>to provide assurances that Mr. Graven held a valid sublease of Airfield land</u>***," (emphasis added by Plaintiff)

23. At a September 4, 2007 meeting (shortly after/during the GRIC/GRAA's then most run at evicting the Plaintiff) between the BIA, Councilman John Antone, the newly elected Board of the Memorial Airfield, and the Plaintiff, the BIA again reaffirmed the validity of the Plaintiff's Sublease

24. At a September 6, 2007 Emergency Council meeting (called for by Councilman Antone), the BIA repeated its position (Please see **Note "4"** just below) now well known to the Court (and recounted by the BIA in their October 19/Exhibit "5").

    At this September 6, 2007 Council meeting, the Council voted in front of some 200 Airfield Landowners, to have Councilman Antone return the Airfield to the Landowners within 90 days…

    …and then, the Council went into "executive Session," and voted to evict all of the Landowners' tenants (destroying the Landowners' business), including the Plaintiff (the only actual tenant with several years on a valid lease).

**Note "4":** The GRIC/GRAA itself notes that the BIA…multiple times, had stated that the BIA had provided assurances to the Landowners that Plaintiff's Sublease was valid (**Exhibit "5,' page 2, Reference 7**).

The GRIC/GRAA even acknowledged that the corporation the Plaintiff acquired had a valid Sublease (**Exhibit "5,' page 2, Reference 1**).

25. But the BIA wouldn't play the game as the GRIC/GRAA wanted…so the Tribe took action…and took, stole, and destroyed Plaintiff's property.

26. The GRIC began efforts to have Superintendant Martinez removed during this time.

27. The Tribe complains (on Sept 12, 2007) that the BIA had not replied to their (the GRIC/GRAA's) July 2007 (again) request to "clarify" its (the BIA's) position as to the Plaintiff's Sublease (**Exhibit "5,' page 2, Reference 5**).

28. The BIA tells/hammers the Tribe with…no, we didn't write, but we told you in

many ways/forums that the Plaintiff's Sublease was valid (**Exhibit '5'** **Reference 6**) (this was just plain harassment by the GRIC/GRAA, as the BIA had already "clarified" its position multiple times) (which the GRIC/GRAA agrees with, per **Note "4"** just above).

29. Bottom line: the Tribe declared the U.S. Government wrong, and not the controlling law over allottees' Trust lands (**Exhibit "5", page 8, Reference 8**), and then willfully, and maliciously, took, stole, and destroyed Plaintiff's property.

30. Plaintiff went to the BIA with the September 7, 2007 Eviction Letter…we discussed such, Plaintiff received assurances such as those seen throughout **Exhibit "5"**.

31. The above September 7, 2007 Eviction Notice was sent by the GRIC/GRAA to the Plaintiff, although (as will be detailed and substantiated below),

   a. The GRIC claims to have passed Council Resolutions (**Exhibits "8a" through "8d"**) that assigned the MAC Master Lease to the GRIC (but even these Resolutions, as does all documentation, require the written approval of the Secretary
   b. ***The Secretary's signature had not been, and has never been obtained…*** (which see proof of in **Exhibit "5," page 5, Reference 9** )
   c. The GRIC's own attorneys had told them they had no legal right to exercise control over the Airfield Master Lease (which see the Heeley/Lewis Memorandum (**Exhibits "9a" and "9b"**)
   d. While the GRIC coerced the BIA into sending a Notice of Trespass to the Plaintiff on June 29, 2006, the U.S. Solicitor ruled that "interpretation" was wrong ( **Exhibit "5," page 7, Reference 10, and page 8, Reference 11**)
   e. July 14, 2006 (which see proof of in **Exhibit "5," page 7, Reference 10**)
   f. August 2, 2006…(**Exhibit "7"**; and which see further proof of in **Exhibit "5," page 8, Reference 11**)
   g. The GRIC Audit from February of 07 reminds the GRIC that they do not have Secretary's written approval and signature, and also reminds them of Heeley Memo (**Exhibits "10a," page 40, Reference 1, and pages 8 and 9, Reference 1, (Please see Note "5" just below)**

**Note "5"**: The Most pertinent pages of the Audit are presented as Exhibit "10a". The entire Audit is presented as Exhibit "10b".

   h. There was no actual entity known as the GRAA (per Audit) (**Exhibit "10a" [page 3, References 1 and 2]**)
   i. Sept 4, 2007 meeting (in which the BIA reaffirmed Plaintiff's Sublease as being valid)
   j. Sept 6 Council meeting (council voted to return Airfield [and then later, in Executive session, to evict all tenants, including the Plaintiff]) (**which see proof of in Exhibit "5," page 10, References 13 and 21**)

32. This was not an eviction, its was a theft, and destruction of Plaintiff's property.

33. There was a September 12, 2007 meeting with then Assistant Secretary of the Interior for Indian Affairs Carl Artman and the GRIC/GRAA and the BIA (which see proof of in **Exhibit "5," page 1, Reference 14).**

34. The GRIC/GRAA was trying to obtain the Secretary's signature to have approval of its (the GRIC/GRAA's) having seized the Airfield. As well, and as previously mentioned, the GRIC/GRAA had been and were trying to have Superintendant Martinez removed. But no approval or signature was obtained (nor is there one as of today)

35. There was another GRIC Council meeting over the proposed eviction of the Plaintiff on October 4, 2007. Yes, the BIA was there, and again reaffirmed its position as the Airfield Master Lease, and the Plaintiff's Sublease. But the Council would not recant from its eviction efforts (which see proof of in **Exhibit "5," page 8, Reference 20, and page 9, Reference 15**).

36. Shortly after the just above described October 4, 2007 Council meeting (and the September 4, and 6 meetings, and the September 12 meeting Mr. Artman), the BIA wrote its October 19, 2007 to set everyone straight (which see more about just below).

37. The Plaintiff, had obviously been receiving continuing assurances from the BIA (which see proof of in multiple examples in **Exhibit "5"**)

38. The Plaintiff "officially" wrote, on October 17, 2007, to the BIA, asking for their help (**Exhibit 11").**

39. The Landowners/beneficial owners of the Memorial Airfield began their own efforts, also asking the BIA for its help (**Exhibits "12a," "12b," and "12c"**) (with more to be seen later).

40. Plaintiff also wrote to GRIC Governor William Rhodes and Councilman Antone, and, implored (**Exhibit "13"**) with them to stop this pending tragedy, and return the Airfield to its proper owners (Plaintiff had been elected by the Landowners to the Executive Committee of the Corporation).

41. On October 18, 2007, the Plaintiff filed a Complaint in GRIC Court for an Injunction (**Exhibit "14"**) seeking to stop Plaintiff's wrongful eviction.

42. The BIA told the Plaintiff about the contents of their October 19 letter (**Exhibit "5"),** and reaffirmed that I did not need to worry.

43. The BIA, seeing how things were needlessly escalating, wrote their October 19, (**Exhibit "5") letter in an attempt to freeze the GRIC/GRAA's pending threat to remove the Plaintiff, and other tenants at the Memorial Airfield.**

44. BIA knew the Tribe was in the wrong, and they (the BIA) should have stepped in…but they didn't, including, they would not even Appear in Court to testify (which see more about just below) that Plaintiff's Sublease was valid (or that the

17

GRIC/GRAA did not have a valid assignment of the Memorial Master Lease).

45. The BIA was Subpoenaed by the GRIC Court Subpoenaed (**Exhibit "15"**).

46. The BIA wrote to the Court stating that it would not Appear to the Court not appearing (**Exhibit "16"**).

47. Plaintiff alleges that the BIA would not appear as Superintendant Martinez was further threatened with additional efforts at Removing her if she Appeared (as she would have had to testify to (simply, the content of her October 19 letter [**Exhibit "5"**]), would have controverted what the GRIC attorneys had filed, and were to say in Court).

48. Plaintiff was a dead duck without the BIA at his Hearing…if the BIA had appeared, and affirmed the things they had said 6 weeks earlier in their Oct 19 (**Exhibit "5"**), and in Council on September 6 and October 4,  letter, Plaintiff, and the Landowners, would have done just fine.

49. At Plaintiff's Court Hearing on November 30, 2007, with no BIA to back-up the Plaintiff, the Court Hearing was a miscarriage of Justice, and Court simply Ruled (**Exhibit "17"**) that I  was not a party to a valid lease…something the BIA could have easily averted.

50. The GRIC/GRAA Law Office made numerous fraudulent representations in this "legal process." (e.g., that they lawfully taken control of the Airfield by Council Resolutions [as per above]).

51. The BIA could have not only diverted (by appearing in GRIC Court) disaster for the Plaintiff, but the Airfield Landowners. The BIA would have not needed to say (in Court) any more than it had said in its October 19, 2007 letter/Exhibit "5."

52. Plaintiff alleges that BIA Pima Agency Superintendent did not appear as she was threatened by the GRIC/GRAA with Removal if she appeared to support the Plaintiff (as happened with Plaintiff's Gila River Community member Advocate, who was threatened with losing her day job, two days before Plaintiff's Hearing [the Advocate Withdrew]).

53. Plaintiff wrote Senator John McCain on December 5, 2007 (**Exhibit "18"**), asking for his help (as did the Memorial; Airfield Board).

54. Senator McCain wrote the BIA asking for their action (which see proof of per in **Exhibits "21," "22a" and "22b," "25," "36," "37," and "42a" and "42b"**).

55. On the morning of December 7, 2007, the BIA was yet telling me not to worry, that the GRIC/GRAA would not actually remove me, and that if necessary they would provide the Plaintiff and his employees with U.S. Marshalls to escort us to and from my facilities.

56. Mid afternoon that day (December 7, 2007), GRIC Police came to physically

remove the Plaintiff…and the BIA would not answer the phone. Plaintiff had not even packed…and has not been able to do his personal tax returns for the three years since.

57. Plaintiff contacted, and sent some materials to Nedra Darling on December 11, 2007. Ms. Darling is the Public Information Officer for the U.S. Department of the Interior for Indian Affairs. Plaintiff was attempting to reach Assistant Secretary Artman (**Exhibit "19"**).

58. Additional materials were provided to Ms. Darling on December 13, 2007 (**Exhibit "20"**).

59. Shortly thereafter, Ms. Darling informed me Mr. Artman was giving this matter to Gerry Gidner, the Director of the BIA. Ms. Darling provided me with Mr. Gidner's direct line.

60. Director Gidner spoke three times, at length, in later December of 2007, and January of 2007 (which see evidence of in **Exhibits "32a" and "32b"**)

61. Plaintiff obtained a copy of the GRIC Audit (**Exhibit "10b"**) (the GRIC/GRAA would not give anyone, including Landowners, or the BIA, a copy. Plaintiff obtained a copy from a GRIC Council Member that was not happy with the GRIC/GRAA was doing to the Airfield Landowners, or its tenants, including the Plaintiff).

62. On January 9, 2008, the BIA, in part, as a result of Senator McCain's Congressional Inquiry, wrote to say that the BIA was on the case (**Exhibit "21"**).

63. On January 31, 2007 (**Exhibits "22a" and "22b"**), the BIA again wrote, saying: "As indicated above, we will provide a final response as soon as we have received the legal advice needed to support a final decision which addresses all of the outstanding issues."

A fax of this January 31 letter, from BIA Western Regional Realty Officer Stan Webb (an attorney), said on it cover (**Exhibit "22b"**): "Will send final response upon completion of legal review."

64. Plaintiff happens to know, that the legal efforts referred by the above letter (and others to follow), were actually completed by May of 2008 (but no final decisions has ever been issued).

65. The Board and Landowners of the Memorial Airfield Corporation continued with their parallel efforts, as can be seen in **Exhibits "23a," 23b." and "23c"**. Such efforts included the Board asking the BIA for help with filing a Writ of Mandamus (per Exhibit "22a"). The BIA has never replied to any of the Board/Landowners letters.

66. Lynford Wilson, the Acting Chairman, and Vice Chairman of the Board, wrote Assistant Secretary Artman on April 2, 2008 (**Exhibit "24"** [a copy of an email]).

67. BIA Director Gidner replied on Mr. Artman's behalf, on May 13, 2008 (**Exhibit "25"**). Mr. Gidner, said, in part:

"The regional Director will be issuing a decision soon, on the validity of the lease and all interested parties will be notified and provided with appeal procedures."

68. Many parties were waiting in good faith.

69. Finally, Plaintiff thought to contact the Assistant Secretary himself. Plaintiff spoke with Ms. Janis Grimes, the Administrative Assistant tot eh Assistant Secretary. (**Exhibit "26"**),

70. Ms. Grimes directed the Plaintiff to the Assistant Secretary's Special Counsel. Mr. Simermeyer called, and asked for some materials (**Exhibit "27"**).

71. Based upon the materials Plaintiff had forward, and discussions with Mr. Simermeyer, he arranged for a meeting with the then Acting Assistant Secretary of the Interior for Indian Affairs (as Mr. Artman had resigned).

72. Plaintiff met with then Acting Assistant Secretary of the Interior for Indian Affairs (Defendant) Gorge Skibine in Washington, D.C., on October 30, 2008 (which see of evidence in **Exhibits "28" and "29"**).

73. Plaintiff later provided additional info to Assistant Secretary Skibine (again, please **Exhibits "28" and "29"**)

74. On June 29, 2009, Plaintiff again contact Ms. Janis Grimes (by phone, then in an email as instructed by Ms. Grimes), this time regarding the then new Assistant Secretary of the Interior of  Echo Hawk July 2009...(**Exhibit "30," at the bottom of page 1, and page 2, Reference 1**)

75. Ms. Grimes responded to Plaintiff's just above inquiry stating (**Exhibit "30," page 1, Reference 2**) that the Assistant Secretary had referred the matter to BIA Director Gerry Gidner for appropriate action (and around and around we go).

76. On August 13, 2009, the BIA provided one of its periodic updates, to Senator McCain, and Plaintiff (Exhibits **"31a" and "31b"**). At this time, then more than one and one-half years later, the BIA stated: "We are in the process of consulting with our Pima Agency; Central Office in Washington, D.C.; and our legal counsel in the Offices of the Solicitor, and we expect to reach a decisions on the matter in the near future." (as noted above, Plaintiff has information that the legal review was actually completed in May of 2008).

77. While Plaintiff (and others) was waiting in good faith, there was occasional contact with various parties, e.g., Mr. Gidner, or Mr. Skibine (e.g., **as per Exhibits "32a" and "32b", and "33a" and "33b"**).

78. Finally, Plaintiff decided, that after more than 2 years, he would contact President Obama, and Assistant Secretary Echo Hawk, invoking Section 229 (**Exhibit "34"**). Plaintiff copied all of the appropriate parties (e.g., the Defendants).

    Neither the President, nor Assistant Secretary Echo Hawk replied.

79. Lynford Wilson, the Acting Chairman, and Vice Chairman of the Memorial Airfield Board, in their continuing efforts, wrote then Deputy Assistant Secretary of the Interior for Indian Affairs Skibine, et al (**Exhibit "35"**), on November 29, 2009.

80. On January 15, 2010, the BIA wrote Senator McCain stating that they would be issuing a final decision "within the next two to four weeks." (**Exhibit "36"**).

81. On February 12, 2010, the BIA wrote Senator McCain to say that, in part, because of heavy snowfall in the Washington area, their decisions had been delayed (**Exhibit "37"**) (later, in January of 2011, the BIA will claim that they have been delayed due to personnel changes…).

82. With more than three years having passed, Plaintiff, on December 13, 2010, filed an Appeal from Inaction against Western Regional Director (Defendant) Bowker (**Exhibit "38"**).

83. Western Regional Director (Defendant) Bowker did not respond (he had 10 days, per the Statue for such Appeals) (which then allowed [for the first time, the Plaintiff could legally go above the BIA] the Plaintiff to Appeal to the Interior Board of Appeals [the "IBIA]).

84. Then, Plaintiff, on December 29, 2010, filed a Notice of an Appeal against Western Regional Director (Defendant) Bowker with IBIA (**Exhibit "39"**).

85. On January 5, 2011, the IBIA issued Orders (**Exhibit "40"**) for Defendant Bowker to provide a status report on the Memorial Airfield matter.

86. On January 28, 2011, Plaintiff filed an Appeal from Inaction against Assistant Secretary (Defendant) Echo Hawk for his inaction in handling the Plaintiff's requests for damages to the Secretary and to the BIA (and to the President, on November 13, 2009 [per Exhibit "34"]) (**Exhibit "41"**).

87. Then, further precipitating the need for an Order in the nature of a mandamus, in Defendant Bowker's reply to the IBIA on February 7, 2011 (**Exhibit "42a"**), he mentions a letter (and includes a copy of such letter) that a month earlier (on January 7, 2011) he had sent to Senator McCain (**Exhibit "42b"**) regarding Plaintiff's claims, and allegedly defines the BIA's (long-time) views of what Plaintiff should be doing in seeking damages for injuries.

    Defendant Bowker, after more than three years of good faith waiting by the Plaintiff, and the tragedies this matter brought to the Plaintiff (and others), tells the Senator that the BIA had previously told me that I should seek (**Exhibit**

**"42b" page 1, Reference 1)** "recourse directly from the GRAA," and denies any duty owed to the Plaintiff.

Defendant Bowker lied to Senator McCain as to what the BIA had allegedly been telling the Plaintiff (which can be seen in the BIA's numerous previous letters (**Exhibits "21," "22a" and "22b," "25," "36," "37," and "42a" and "42b"**). Bowker says:

> "In a January 7, 2011, response to an inquiry made by Senator McCain on Mr. Graven's behalf, we indicated that "with respect to the termination of Mr. Graven's sublease (and the "confiscation" of certain personal property which allegedly followed), we have advised Mr. Graven to seek recourse directly from the GRAA, which (acting as the presumptive mater lessee) was/is responsible for those actions."

And Defendant Bowker did not even have the common courtesy to send the Plaintiff a copy of his letter to Senator McCain, or write a separate letter to the Plaintiff, telling him that the BIA was unceremoniously dumping the Plaintiff's body along the side road.

88. Assistant Secretary (Defendant) Echo Hawk's attorney, Mr. Sequoyah Simermeyer called the Plaintiff on February 7 (the 10th day of Appeal from Inaction), and asked for an update. Plaintiff had met Mr. Simermeyer more than two years earlier when meeting then Acting Assistant Secretary (Defendant) Skibine.

89. Plaintiff later called Mr. Simermeyer, and left a voicemail message saying that the Plaintiff would toll any further action (e.g., a Notice of an Appeal with the IBIA) if the Plaintiff could get some reassurance that we would move forward.

90. Mr. Simermeyer did not return Plaintiff's call/voicemail.

91. Assistant Secretary (Defendant) Echo Hawk did not reply to Plaintiff's Appeal from Inaction.

92. Plaintiff filed a Notice of an Appeal against Assistant Secretary (Defendant) Echo Hawk on February 15, 2011 (**Exhibit "43"**) (mention of a pending FOIA Appeal is also made).

93. On February 23, 2011, Ms. Mary Milam called the plaintiff. Ms. Milam is Administrative Assistant to Assistant Secretary (Defendant) Echo Hawk, and his Chief of Staff, Mr. Paul Tsosie. Ms. Milam informed me that Assistant Secretary (Defendant) Echo Hawk had received word about my Appeals, and that he had asked people to jump on this situation and have a report to him by the following Tuesday (March 1) morning.

94. Plaintiff spoke with Ms. Milam again on Friday, February 25. Ms. Milam asked for material that would give Assistant Secretary (Defendant) Echo Hawk an overview of just where we were at. (**Exhibit "44"**)

95. On March 3, Plaintiff called his old contact in the Assistant Secretary's Office, Ms. Janis Grimes, and left a voicemail for her for Assistant Secretary (Defendant) Echo Hawk regarding Plaintiff's intention to file the present Complaint.

96. On March 7, the IBIA docketed Plaintiff's Notice of an Appeal, but also Dismissed it for lack of jurisdiction (**Exhibit "45").**

97. Plaintiff called the Solicitor's office in WDC on Friday, March 18 (the Friday before this day/Thursday filing this Complaint). Plaintiff was told there were so many matters to handle, that, basically, the ones that entail lawsuits are the only ones that get answered.

98. On Monday of this week, March 21, Plaintiff received a chance call from Chief of Staff Mr. Paul Tsosie.

99. Also on Monday of this week, Plaintiff called the U.S. Attorney in Phoenix, to see if I might obtain some information regarding including the President, and then, if appropriate, have him Served. Plaintiff spoke with an attorney who was not familiar with Section 229, but then upon checking, stated that it was in fact a current stature (and had not been repealed). We also discussed that it appeared the President needed to be named, and how to have him Served.

## CONCLUSION

Certain members of the Gila River Indian Community, took, stole, and destroyed tens of millions of dollars of property belonging to the Plaintiff (actually, the figure is much higher than just tens of millions). Such taking was willful, and malicious, and against direct instructions from the BIA.

Plaintiff has been patient.

Plaintiff's invoking 25 U.S.C. Section 229 is proper.

The Defendants should have long ago followed the mandate of Section, and assisted the Plaintiff in recovery of damages for injuries.

## RELIEF SOUGHT

Plaintiff respectfully requests that this Court assume jurisdiction over this matter.

Plaintiff respectfully requests an Order from this Court to compel the Defendants to perform their nondiscretionary duty to the Plaintiff as prescribed in 25 U.S.C., Chapter 6, Subchapter 1, Section 229, specifically, now (i.e., "now," after other extensive efforts as have been exerted, and as it is beyond twelve months, as per Section 229), that the Defendants meet

23

with the Plaintiff, to fairly negotiate and reach settlement for damages from injuries.

Plaintiff also prays for other relief as the Court deems appropriate.

Thanking the Court in advance for its consideration.

Respectfully submitted this 24th day of March 2011, by: _____, In Pro Se.

Plaintiff Will Graven

Original of this Complaint filed the Clerk of District Court this 24th day of March 2011

Conformed copy of this Complaint will be Served upon the Defendants as prescribed by Rule 4 of the Federal Rules of Civil Procedure

STATE OF ARIZONA           )
                                          )ss:
County of Maricopa         )

        William A. Graven, being first duly sworn upon his oath avows that he has written and therefore read this Complaint and that the allegations contained therein are true and correct, based upon his personal knowledge, except as to allegations made upon information and belief, and as to such allegations and information, he believes them to be true. As well, as to the Exhibits attached hereto, I avow that the copies of documents provided herein as Exhibits are true and correct copies of the originals. Should I be called upon to testify under oath as to the truthfulness of this Complaint and its contents, and Exhibits I would be able to do so.

        DATED this 24th day of March, 2011.

_____
William A. "Will" Graven

        Subscribed and sworn to before me, the undersigned Notary Public, this 24th day of March, 2011 by Will Graven.

_____
Notary Public

My Commission Expires: 10/21/14



OFFICIAL SEAL
GEOFF L. ERBER
NOTARY PUBLIC - State of Arizona
MARICOPA COUNTY
My Comm. Expires Oct. 21, 2014

## **Certificate of Service**

I hereby certify that upon receipt of the Summons for this Complaint, I will have the Defendants Served a Conformed Copy of this Complaint and a Summons in accordance with Rule 4 of the Federal Rules of Civil Procedure.

Dated this 24th day of March, 2011, _____
                                 Will Graven

25